## In re CHICKEN ANTITRUST LITIGATION AMERICAN POULTRY, et al., Appellants.

### No. 80–7808.

United States Court of Appeals,
Fifth Circuit.*
Unit B

March 1, 1982.

---

1. I am advised that counsel's arguments in such cases are now recorded and made a part of the record.

\* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Solly Robins, St. Paul, Minn., Stanford Robins, David E. Bland, Minneapolis, Minn., for appellants.

Edward H. Lee, Savannah, Ga., for The Bd. of Pub. Ed. for City of Savannah and County of Chatham.

Emmet J. Bondurant, Atlanta, Ga., Jerrold E. Salzman, Chicago, Ill., John R. Flowers, Jr., Dept. of Justice, New Orleans, La., Arthur Galligan, James vanR. Springer, Washington, D.C., James M. Landis, Tampa, Fla., Granvil I. Specks, Chicago, Ill., Jeffrey T. Morris, Harrisburg, Pa., Alan L. Kovacs, Asst. Atty. Gen., Boston, Mass., for appellees.

Before HILL and VANCE, Circuit Judges, and LYNNE,** District Judge.

VANCE, Circuit Judge:

In this appeal, we are called upon to review the interclass allocation of a settlement in an antitrust class action. Sixty direct purchasers of chickens have objected to the interclass sharing agreement that was reached by the representatives of the different plaintiff classes in this suit prior to substantial negotiations with any of the defendants. The objectors challenge the allocation plan on three grounds. First, they allege it was the result of bargaining by attorneys whose representation of the various classes was tainted by a conflict of interest. Second, objectors contend that the allocation is unfair in light of available

** The Honorable Seybourn H. Lynne, United States District Judge for the Northern District of Alabama, sitting by designation.

market data and the landmark Supreme Court decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). Finally, objectors argue that their due process rights were violated because there was insufficient information before the district court to enable it to judge the ultimate fairness of the allocation agreement. After carefully reviewing the record in light of these objections, we affirm the district court's approval of the interclass sharing proposal.

## I.

In April 1973 the United States Department of Justice filed a civil antitrust action against the National Broiler Marketing Association (NBMA) in the United States District Court for the Northern District of Georgia. The complaint alleged that the NBMA, its members, and other chicken producers had conspired to fix broiler prices and restrict broiler production in violation of section one of the Sherman Act, 15 U.S.C. § 1.[1] In particular, the Justice Department sought an injunction[2] against the continuation of a conference call program by which the NBMA allegedly coordinated the pricing and production decision of its members and some participating nonmember chicken producers.

The government's lawsuit spawned a rash of private civil actions against the NBMA and the participants in the conference call program,[3] beginning with the March 1974 filing of a class action on behalf of all state and local governmental entities.[4] Ultimately, thirty-three individual or class suits were filed against the NBMA and forty-two individual defendants. These actions were con-

1. Section one of the Sherman Act provides in pertinent part:

   Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal .... Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1 to 7 of this title to be illegal shall be deemed guilty of misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

   15 U.S.C. § 1.

2. Although section one provides only for criminal sanctions, section four of the Sherman Act grants to the federal courts subject matter jurisdiction to entertain civil actions brought by the government as well:

   The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of sections 1 to 7 of this title; and it shall be the duty of the several United States attorneys, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited.

   15 U.S.C. § 4.

3. The Sherman Act provided only for governmental enforcement of the antitrust laws. In 1914, however, Congress enacted the Clayton Act to supplement the Sherman Act by sanc-

tioning private antitrust actions. Clayton Act, ch. 323, 38 Stat. 730 (1914) (codified as amended at 15 U.S.C. §§ 12–27).

   Section four of the Clayton Act provides for damage suits by private parties:

   Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

   15 U.S.C. § 15.

   Section sixteen of the Clayton Act authorizes private injunctive actions and provides in pertinent part:

   Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity ....

   15 U.S.C. § 26.

4. Many states and some municipalities opted out of the class action pursuant to Rule 23(c)(2) of the Federal Rules of Civil Procedure and brought separate antitrust actions against the NBMA and the participants in the conference call program.

solidated[5] in the Northern District of Georgia.[6]

On February 20, 1975 plaintiffs filed a joint motion seeking class certification of five classes based upon functional distinctions among the plaintiffs: governmental entities; supermarkets; hotels, restaurants, and contract institutional feeders; fast food establishments; and wholesale distributors.[7] In arguing against certification, defendants raised a variety of objections relating to individual damage issues and class manageability. The district court refused to certify the classes at that time, and directed that the parties begin discovery. Discovery continued throughout much of the next two years, during which time the district court twice noted its reservations about the manageability of classes containing both direct and indirect broiler purchasers.

Although two of the defendants reached a settlement with the plaintiffs in April 1975, no serious settlement negotiations occurred until 1977. This inaction was due in large part to the NBMA's reluctance to negotiate while it tested a defense in the parallel action by the Justice Department that it was an agricultural cooperative and therefore immunized from liability for antitrust violations by the Capper-Volstead Act, 7 U.S.C. §§ 291–292. It was also partially the result of the demand by plaintiffs that each defendant stipulate to class certification.

In an effort to solidify their negotiating posture and improve the chances for class certification, counsel for the class representatives met on November 17, 1976 to negotiate an interclass allocation of the expected settlement or judgment proceeds. At that meeting the liaison counsel advised the attorneys present of the need to reach an allocation agreement, but otherwise did not participate in the negotiations. After the liaison counsel had spoken, an attorney who represented the supermarket class as well as several members of the governmental entities class took the lead. He stated that he could not represent all of his clients at that point, and that he elected to represent only the supermarket class. Another lawyer was to represent the governmental entities class, although he also was the attorney for the fast food class. Yet another attorney was designated to represent the fast food class in the allocation negotiations. Despite this shifting representation, one lawyer represented the wholesale distributor class exclusively during these negotiations and throughout all of the subsequent proceedings. The following agreement resulted from the negotiations, subject to ratification by the state attorneys general who did not participate in the negotiations:

| Class I | Governmental Entities | 15% |
|---|---|---|
| Class II | Supermarkets | 50% |
| Class III | Hotels, Restaurants, Institutional Feeders | 11% |
| Class IV | Fast Food Distributors | 14% |
| Class V | Wholesale Distributors | 10% |

While market share of purchases was the starting point of the negotiations, other factors, such as actual damages, ease of proof, and responsibility in the lawsuit, were taken into account to reach the final agreement.[8]

5. On plaintiffs' motion, the judicial panel on multidistrict litigation ordered the thirty-three private lawsuits consolidated pursuant to 28 U.S.C. § 1407.

6. On December 24, 1975 the district court dismissed for improper venue lawsuits against four defendants that had originally been filed in the Northern District of Georgia. Plaintiffs filed new complaints against the four defendants in the proper judicial districts and then invoked the "tag-along" transfer provision to consolidate the actions in the Northern District of Georgia. See Rules 1, 9, and 10 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation; 28 U.S.C. § 1407(f).

7. At the time of this motion no plaintiffs representing wholesale distributors had filed suit in these proceedings. The other plaintiffs recognized the necessity of including this class, however, and provided for such a class from the outset. Suit was eventually filed on behalf of this class in April 1976, after much of the legal work relating to the NBMA's alleged antitrust immunity had been completed, but before any substantial settlement or allocation negotiations had taken place.

8. Admittedly, these other factors besides market data primarily worked to reduce the share of the wholesale distributor class. As the affidavit of the liaison counsel, Emmet J. Bondu-

The allocation plan had not yet been approved by all of the plaintiffs when on June 9, 1977 the Supreme Court decided *Illinois Brick Co. v. Illinois*, 431 U.S. at 720, 97 S.Ct. at 2061. At that point the attorney for the wholesale distributor class insisted on a greater share of the settlement proceeds because his class was composed almost entirely of direct purchasers who had obtained an enhanced position in the lawsuit after *Illinois Brick*. The other class representatives agreed and negotiations resumed to increase the share of the wholesale distributor class. These negotiations led to the consolidation of classes three and four into one class of food preparers and a large increase in the wholesale distributor class' share of the settlement proceeds at the expense of the food preparers and governmental entities classes. The supermarket class share remained the same because this class was also comprised primarily of direct purchasers. The new allocation scheme provided for the following distribution:

| Class | I | Governmental Entities | 9.4% |
|---|---|---|---|
| Class | II | Supermarkets | 50.0% |
| Class | III | Food Preparers | 15.6% |
| Class | IV | Wholesale Distributors | 25.0% |

The allocation scheme was presented to the district court for approval on July 13, 1977, but the court did not rule on it.

Prior to the decision in *Illinois Brick*, this court ruled adversely to the NBMA on its claim of antitrust immunity under the Capper-Volstead Act. In *United States v. National Broiler Marketing Association*, 550 F.2d 1380 (5th Cir. 1977), aff'd 436 U.S. 816, 98 S.Ct. 2122, 56 L.Ed.2d 728 (1978), we held that the NBMA was not an agricultural cooperative whose actions were immune from antitrust scrutiny. This decision spurred defendants to begin serious settlement negotiations because it effectively eliminated their defense from liability in the private civil suits. Over the next five

months settlement negotiations proceeded rapidly and plaintiffs reached agreement with all but three defendants. Defendants would not agree to any settlement, however, unless they were assured of "total peace" in the future. Accordingly, they insisted upon a settlement that included all potential plaintiffs in any state or federal antitrust action, and they demanded the creation of a fifth, catchall class of other direct purchasers. This demand necessitated the negotiation of a third interclass sharing proposal, the one that is before us now. Counsel for the class representatives decided that they would fix the share of the governmental entities class without regard to the new class. They also determined that members of the new class should receive the same return on purchases as the average return for classes two, three, and four. The negotiations led to the following allocation proposal:

| Class | I | Governmental Entities | 9.40% |
|---|---|---|---|
| Class | V | Other Purchasers | That proportion of 90.60% equal to class five's proportion of overall claims filed by nongovernmental classes |
| Class | II | Supermarkets | 55.19% of balance |
| Class | III | Food Preparers | 17.22% of balance |
| Class | IV | Wholesale Distributors | 27.59% of balance |

Subsequent to these negotiations, class notice was sent to over 200,000 broiler purchasers describing the settlement and allocation plan.

Agreement was reached with the three remaining defendants [9] and plaintiffs moved to have the classes certified and the entire settlement and allocation agreement approved. Class certification was stipulated to as part of the settlement agreement and approved by the district court on March 29, 1979. The district court held a hearing

---

rant, makes clear, however, this reduction resulted from the belief that wholesalers generally passed on their increased costs and that ultimate consumers suffered most of the actual injury stemming from the alleged price-fixing. It should be noted that the wholesale distributor class was represented at the negotiations and obviously acceded to this analysis.

**9.** The settlement negotiations resulted in a fund in excess of $30,000,000 that is expected to exceed $35,000,000 by the time it is distributed. This contrasts favorably from the plaintiffs' point of view with their own estimates of damages, which ranged from $23,000,000 to $26,-000,000.

on November 19, 1979 regarding the settlement. For the first time the objectors challenged the interclass allocation agreement, although they did not challenge the actual settlement with defendants. On March 7, 1980 the district court issued an order approving the settlement. It reserved the questions pertaining to the allocation agreement, however, and requested that the parties brief the issue.[10] On August 22, 1980 the district court approved the allocation agreement. It refused to enter a final judgment in the case, but certified the question regarding the allocation plan for interlocutory appellate review.

## II.

At the outset, we are confronted with a challenge to our jurisdiction to hear this appeal. Appellee settlement proponents contend that appellants' objections to the sharing proposal raise issues which are ancillary to the class certification decision and the March 7 approval of the settlement fund. In effect, appellees argue that the orders were tantamount to final judgment in this case, and that by failing to appeal those orders, objectors lost all right of appeal here. We find this argument devoid of merit.

As a general rule, only final orders of the district court are appealable and unless an order fully disposes of all issues in a case it is not usually final. *Brown v. New Orleans Clerks and Checkers Union No. 1497*, 590 F.2d 161, 163–64 (5th Cir. 1979). This rule expresses a policy against piecemeal appeals that is embodied in the final judgment rule codified at 28 U.S.C. § 1291.[11] *See Baltimore Contractors, Inc. v. Bodinger*, 348 U.S. 176, 178, 75 S.Ct. 249,

250, 99 L.Ed. 233 (1955). Appellees' contention that appellants should have challenged the interclass sharing proposal by appealing the March 7, 1980 order misreads our precedents concerning the final judgment rule. As we have said, "the finality issue is to be examined in light of practical, rather than narrowly technical, considerations." *Litton Systems, Inc. v. Southwestern Bell Telephone Co.*, 539 F.2d 418, 425 (5th Cir. 1976). We conclude that the orders approving the settlement agreement and class stipulation were merely interlocutory orders necessary for the efficient administration of this case and not final orders that disposed of the issue now before us. This, of course, reflects the fact that no overall settlement can be adjudged fair or unfair unless the allocation scheme is also examined; clearly, the fairness of the scheme to allocate the rewards of the settlement among the plaintiff classes was not determined when the district court decided to approve the settlement fund and to simplify the litigation alignment. As long as a matter such as this remains open, unfinished, or inconclusive, an order will not be considered final regardless of its characterization, and there may be no intrusion by appeal. *See Southern Methodist University Association of Women Law Students v. Wynne & Jaffe*, 599 F.2d 707, 711 (5th Cir. 1979); *see also Clark v. Lomas & Nettleton Financial Corp.*, 581 F.2d 516 (5th Cir. 1978) (order tentatively approving settlement of securities case is not final order).

Appellees argue that if the order approving the settlement agreement was not a final judgment, it was nonetheless an order falling within the collateral order exception to the final judgment rule.[12] Ap-

10. On August 13, 1980 the court approved the proposed attorney fees. The fees totaled less than fifteen percent of the entire fund.

11. Section 1291 provides:

The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, ex-

cept where a direct review may be had in the Supreme Court.
28 U.S.C. § 1291.

12. The collateral order exception allows interlocutory appeals when the appealed order is: (1) a final determination of a claim separable from the main action; (2) too important to be denied review; and (3) too independent from the main action to require delayed appellate review. *In re Nissan Motor Corp. Antitrust Litigation*, 552 F.2d 1088, 1094 (5th Cir. 1977)

pellees argue that because the allocation agreement was "ancillary" to the settlement agreement, the issue of allocation must have been decided by appealing the collateral order approving the settlement agreement. Stripped to its essentials, this argument would require parties to take all interlocutory appeals or face the possibility of losing their right to appeal questions that are arguably related to the collateral order. Making interlocutory appeals mandatory in this manner would turn the policy against piecemeal appeals on its head. *Cf. Williams v. City of New Orleans*, 565 F.2d 874 (5th Cir. 1978) (class certification order generally not appealable). We conclude that objectors did not lose their right to appeal the terms of the allocation proposal by failing to appeal the district court's order approving the settlement agreement with defendants and certifying the classes.[13]

■ Our rejection of appellees' arguments simplifies the question whether this court has appellate jurisdiction to hear this case. Appellants filed a timely notice of appeal from the order approving the allocation proposal, the district court certified that issue for appeal, and a panel of this court accepted jurisdiction. *In re Chicken Antitrust Litigation*, No. 80–8610 (5th Cir. Oct. 10, 1980). Therefore, the case is properly before us pursuant to 28 U.S.C. § 1292(b).[14]

(citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949)).

**13.** In our discussion, we do not decide whether either of the earlier orders of the district court would have been appealable as a collateral order.

**14.** Section 1292(b) provides:
When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an

## III.

Appellant objectors first contend that the district court should have disapproved the settlement allocation plan because it was negotiated by attorneys with conflicts of interest that adversely affected their representation of one or more classes. Objectors point to the original negotiations at which certain counsel were assigned to represent certain classes even though they had clients who were members of other classes. This, they contend, so infected the negotiations that no arms length bargaining was possible and the interests of certain classes were sacrificed to the interests of others.

■ Objectors are members of the wholesale distributor class. This class was represented throughout the allocation negotiations by one attorney who represented no other clients. This attorney continued to represent the class throughout the litigation and was responsible for instituting new negotiations once the *Illinois Brick* decision was announced. Whatever irregularities there may have been that affected members of the other classes,[15] members of this class were protected by adequate counsel without any conflict of interest. *Cf. In re Beef Industry Antitrust Litigation*, 607 F.2d 167, 179 (5th Cir. 1979), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d

appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.
28 U.S.C. § 1292(b).

**15.** *See generally Developments in the Law— Conflicts of Interest in the Legal Profession*, 94 Harv.L.Rev. 1244, 1292–1317 (1981). Although there may be the potential for a conflict of interest to arise, it is best to avoid second guessing the judgment of counsel in settlement negotiations absent an actual conflict of interest which renders effective representation impossible. *Cf. United States v. Risi*, 603 F.2d 1193, 1195 (5th Cir. 1979) (actual conflict of interest must be demonstrated); *Aetna Cas. & Sur. Co. v. United States*, 570 F.2d 1197, 1200–02 (4th Cir.), *cert. denied*, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978) (objection of conflict of interest overridden because no demonstration of actual conflict).

405 (1981) (one named plaintiff without conflict can protect interests of class even if other named plaintiffs have conflicts). Appellants nonetheless contend that the conflicts of interest among the class counsel for the other classes distorted the entire bargaining structure and placed the wholesale distributor class in an unnaturally weak bargaining position. We are unpersuaded by this argument. Counsel for the wholesale distributor class had but one interest throughout the negotiations, protecting the interests of that class. He alone could bargain away the interests of that class; the number or type of clients another lawyer may have represented had no bearing on such a decision. *See Reynolds v. National Football League*, 584 F.2d 280, 286 (8th Cir. 1978) (theoretical conflicts of interest do not require disqualification of counsel or disapproval of settlement). That counsel for the wholesale distributor class forced renegotiation after *Illinois Brick* is further proof that he vigorously protected the interests of his class regardless of the alignment of other attorneys.

Even if we were to assume that a potential conflict existed that would have prevented effective representation at trial, our conclusion would remain the same as to the settlement negotiations. Even " 'irregular settlement negotiations may . . . form the basis for a judicially acceptable class action settlement.' " *In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 207–08 (5th Cir. 1981) (*Container I*) (quoting *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1131–32 (7th Cir.), *cert. denied*, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979)). It is enough if representation of the class during the negotiations was adequate and that the settlement itself is fair. We will consider the fairness of the allocation terms in a later section of this opinion; it is sufficient for our purposes here to say that we believe that the agreement was fair. We also believe that the objectors received adequate representation during the negotiations. *Container I* teaches us that class members in settlement negotiations receive adequate representation if: (1) the general interests of all class members are amenable to unified representation, and (2) no specific feature of the settlement sacrificed the interests of some class members to those of others. *See Container I*, 643 F.2d at 208. Clearly, the first prong of our test for adequate representation was met. At the stage of negotiations all members of the wholesale distributor class shared a single goal, that of maximizing the class' share of the settlement proceeds, and were thus amenable to unified representation. As to the second prong of our test, it is up to the objectors to point to a trade-off of their rights and actual prejudice. *Id.* Objectors have failed to present any specific evidence that their interests were unfairly compromised apart from their general complaint that their share of the rewards was unsatisfactory. The percentage the class received was admittedly low at the outset, but appellees have adequately explained the reasons for such a share. Thus, even if objectors have demonstrated the existence of a conflict of interest that affected them, which we doubt, appellants have failed to demonstrate that their rights were unfairly compromised by such a conflict and the district court properly refused to disapprove the sharing proposal on these grounds.[16]

---

16. Fifty-nine of the objectors were members of the wholesale distributor class and thus were represented by counsel whose efforts were not tainted by the specter of a conflict of interest. The final objector, however, was a member of the supermarket class and may properly complain of a conflict of interest. Consequently, we must evaluate this claim in light of the standards announced in *In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 207–09 (5th Cir. 1981). In this case, the supermarket objector has failed to show any unfair trade-off of its rights or actual prejudice stemming from the allegedly tainted allocation negotiations. In addition, this objector has not even suggested that the representative of the supermarket class had any goal but to maximize the share of the class and, consequently, the expected legal fees that would result from representation of the class. Finally, the large share the class received in this case undermines any argument as to inadequate representation of the supermarket class.

## IV.

■■■■ Appellants next contend that the interclass sharing proposal should be disapproved because it is not fair, adequate, and reasonable. Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval of any class action settlement,[17] but it does not provide any standards for such approval. It is now clear, however, that to approve a settlement, the district court must find that it "is fair, adequate and reasonable and is not the product of collusion between the parties." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). This standard applies with as much force to the review of the allocation agreement as it does to the review of the overall settlement between plaintiffs and defendants. *See Container I*, 643 F.2d at 218–21. Determining the fairness of the settlement is left to the sound discretion of the trial court and we will not overturn the court's decision absent a clear showing of abuse of that discretion. *See Miller v. Republic National Life Insurance Co.*, 559 F.2d 426, 429 (5th Cir. 1977) (citing *Young v. Katz*, 447 F.2d 431, 433 (5th Cir. 1971)). *Accord, City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir. 1974); *In re International House of Pancakes Franchise Litigation*, 487 F.2d 303, 304 (8th Cir. 1973). In addition, our judgment is informed by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement. As we have said elsewhere, a "just result is often no more than an arbitrary point between competing notions of reasonableness." *In re Corrugated Container Antitrust Litigation*, 659 F.2d 1322, 1325 (5th Cir. 1981) (*Container II*).

■■■■ Appellants primarily contend that the allocation agreement is unfair because it enables indirect purchasers to recover part of the settlement fund notwithstanding the decision in *Illinois Brick*, 431 U.S. at 720, 97 S.Ct. at 2061. Appellants fail to recognize that the starting point for the settlement negotiations was defendants' insistence upon "total peace." Defendants' insistence upon obtaining a complete release from all significant potential plaintiffs necessarily meant that no settlement would have been reached unless indirect purchasers released their claims against defendants. This, in turn, meant that indirect purchasers had the power to frustrate any settlement and unless those classes primarily composed of indirect purchasers also received a share of the settlement proceeds, there would have been no settlement.

Of course, had indirect purchasers been completely without any colorable legal claims against defendants, it would have been an abuse of the court's discretion to allow them to share in the settlement fund. That is not the case. Indirect purchasers held many potential claims against defendants which required releases before total peace could be obtained. First, despite the holding of *Illinois Brick* as to monetary damages, the indirect purchasers were not without any federal remedies to redress the injury they suffered as a result of defendants' putative antitrust violations. *Illinois Brick* rests not on a lack of injury to indirect purchasers, but on the belief that difficulties in proving indirect damages might weaken the effectiveness of private antitrust actions. Consequently, this circuit has held that indirect purchasers may obtain injunctive relief pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26, even if monetary relief is generally unavailable. *In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1167 (5th Cir. 1979), *cert. denied*, 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980). It is also apparent that many of the indirect purchasers could resort to state law remedies to vindicate their claims against defendants. Many states have tried to fill the interstices of federal antitrust law by enacting legislation which

17. Rule 23(e) of the Federal Rules of Civil Procedure provides:

Dismissal or Compromise. A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

allows suits by indirect purchasers.[18] Whatever the status of indirect purchasers in a federal damages action, they still had claims that had to be released if the defendants were to have total peace. *Cf. Container I*, 643 F.2d at 221–22 (release of state law claims was one part of the settlement of a federal antitrust case); *Oswald v. McGarr*, 620 F.2d 1190, 1198 (7th Cir. 1980) (release of future claims was an important element of antitrust settlement).

*Illinois Brick* itself also left open the possibility of suits by some indirect purchasers. In generally rejecting antitrust damages claims by indirect purchasers, the Supreme Court stated an exception for those indirect purchasers who can demonstrate that normal market pressures to establish prices had somehow been circumvented. Thus, if direct purchasers used a "cost-plus" pricing schedule or were owned or controlled by the producer, indirect purchasers who bought from them could bring suit. 431 U.S. at 735–36 & n.16, 97 S.Ct. at 2069–70. In this case, there is evidence to suggest that both exceptions to the *Illinois Brick* rule apply to some of the plaintiff purchasers. Both objectors and proponents introduced affidavits concerning "cost-plus" pricing. We agree with the district court that whether or not wholesale distributors used such a system, the issue of "cost-plus" pricing created enough problems so that a settlement could reasonably try to take them into account by including indirect purchasers in the allocation fund. In addition, allegations that some of the members of the wholesale distributor class were corporate subsidiaries of broiler producers created the possibility that some direct purchasers might not be entitled to damages if the suit went to trial. Certainly the problems that could arise from this issue favored inclusion of indirect purchasers in the settlement for

they would benefit from proof of this situation. Finally, proposed legislation to overrule the holding of *Illinois Brick* created legitimate uncertainties about the status of indirect purchasers,[19] thus further favoring their inclusion in the settlement. Although this legislation was not enacted, it was reasonable for the settlement negotiations to take into account these political developments and it was not an abuse of discretion for the district court to do the same. *Container II*, 659 F.2d at 1328.

Other considerations also favor inclusion of indirect purchasers in the settlement distribution. At no point during the settlement negotiations had the district court certified the case as a class action. In fact, the court had on two occasions expressed doubts as to the manageability of classes that contained both direct and indirect broiler purchasers. To shore up their position on class certification and their consequent negotiating power, the plaintiff class representatives decided to reach an allocation agreement and thus demonstrate the effectiveness and manageability of the class actions by removing the major potential source of intraclass dispute. It was not an abuse of the court's discretion to take into account the benefit that accrued to all of the plaintiff classes by virtue of the participation of the indirect purchasers in the settlement agreement. *See id.* Additionally, because of the uncertain economic effect of the NBMA's conference call program both direct and indirect purchasers faced great difficulty in proving damages. Unless the case was settled, there was a very real chance that none of the plaintiffs would be able to recover any monetary damages. *Cf. Cotton v. Hinton*, 559 F.2d at 1330 (inquiry into fairness should contrast settlement rewards with likely rewards if case goes to trial); *Lowenschuss v. Bluh-*

**18.** *See, e.g.,* Ala.Code § 6–5–60 (1975) (indirect purchasers have right of damages actions against violators of state antitrust laws); Cal. Bus. & Prof. Code § 16750(a) (1981) (individual may sue for indirect injury to business from antitrust violation). *Cf.* Fla.Stat. §§ 542.18–542.23 (1980) (state may sue *parens patriae* for violations of state antitrust laws).

**19.** *See* S. 1874, 95th Cong., 1st Sess. (1977) (introduced by Sen. Kennedy); H.R. 8359, 95th Cong., 1st Sess. (1977) (introduced by Rep. Rodino). *See generally* Calkins, Illinois Brick *and its Legislative Aftermath*, 49 Antitrust L.J. 967 (1978); II P. Areeda & D. Turner, Antitrust Law ¶ 337(d)-(g) (1978).

*dorn,* 613 F.2d 18, 19–20 (2d Cir.), *cert. denied,* 449 U.S. 840, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980) (costs of further litigation and risks of proof difficulties militate in favor of settlement approval). Furthermore, the problem of hybrid purchasers— those who bought broilers directly from producers as well as indirectly through wholesalers—militated in favor of allowing the arm's length negotiations among plaintiff classes to determine the allocation plan. The plan obviated the necessity for particularized proof that would have extended the entire litigation as well as increased the risk that certain plaintiff classes would refuse to approve the settlement because of difficulties with the planned allocation.[20] Again, this court has stated that considerations of proof difficulties and the presence of hybrid purchasers were permissible factors in evaluating a settlement. *Container II,* 659 F.2d at 1327–28; *see also In re Equity Funding Corp. of America Securities Litigation,* 603 F.2d 1353, 1365 (9th Cir. 1979) (fair to consider "the almost impossible task of determining the distribution of the settlement fund among the myriad claimants").

■ Objectors also complain that the allocation scheme should be disapproved because it bears no relation to economic data as to relative injury. To justify this position objectors present several calculations showing that wholesalers will receive less

per pound in damages than members of the other classes. While superficially appealing, this argument cannot withstand analysis. The reason that wholesalers might receive less damages per pound of purchase is not a result of discrimination against that class, but rather is the result of a much greater claims response by wholesalers.[21] Ideally, of course, all plaintiffs should share equally in the settlement, but variances among plaintiffs in their response to litigation that skew the ideal have to be expected. We find it sufficient that there was a rough correlation of the settlement distribution to functional market shares[22] which allows for industry-wide reparations. Had the uneven claims response enhanced the individual share of wholesaler plaintiffs, we are confident that these objectors would merely ascribe the result to luck rather than to intrinsic unfairness of the allocation plan.

■ All of the above considerations convince us that the inclusion of indirect purchasers in the sharing proposal was reasonable, that the sharing proposal was adequately supported by economic data, and that the sharing proposal was fair, adequate, and reasonable. We will not disturb the district court's exercise of discretion.

### V.

■ Objectors finally complain that there was insufficient discovery before the

---

**20.** Objectors specifically attack the allocation arrangement which excused the governmental entities class members from submitting claims and proof of damage. Although admittedly unusual, this arrangement seems to be a fair response to the particular difficulties that this class would have in gathering and presenting evidence of damages. In addition, because of a fear that the costs of gathering such proof would exceed the amount received, the state attorneys general insisted upon this feature before relinquishing their claims against defendants. Finally, many states provide for criminal penalties for state antitrust violations, thus giving the state attorneys general a unique claim against defendants and added bargaining strength. *See, e.g.,* Ala.Code §§ 8–10–1, 8–10–2, 8–10–3 (1975); Fla.Stat. §§ 542.21–542.27 (1980).

**21.** Altogether, some 2,404 claims had been filed by the time the allocation agreement was be-

fore the district court, 913 of which were from members of the wholesale distributor class.

**22.** Objectors contend that as a class they accounted for forty-two percent of all direct broiler purchases. We note initially that this market data derives from 1975 sales figures, a period fully two years after the termination of the conference call program. It is just as easy to use 1969 market figures that demonstrate that wholesale distributors accounted for a market share of slightly less than twenty-five percent. Given the uncertain market figures as well as the evidence of cost-plus pricing and wholly owned wholesale subsidiaries, evidence which would reduce the share of the wholesale distributor class, we are unable to agree with objectors' contentions that the district court had inadequate economic data to justify the allocation agreement and thus abused its discretion in approving the sharing proposal.

allocation agreement was hammered out to enable the negotiations to be suitably informed by economic data or to enable the judge to evaluate the fairness of the agreement. This contention has been mooted, however, by the decision in *Container I.* There, we held that formal discovery is not "a necessary ticket to the bargaining table." 643 F.2d at 211. If the record shows unmistakably that the settlement was the product of uneducated guesswork, the district court may be within its discretion to disapprove a settlement without ever considering whether the agreement is fair. *Id.* The record in this case clearly demonstrates, however, that plaintiffs had adequate economic data about the broiler market as well as knowledge of actual economic injury when they negotiated the allocation formula. This suffices to ensure that this case is not one in which unscrupulous actors were leading the blind. *See id.* Because plaintiffs placed this economic data in the record, there was also enough information before the court to allow it to make an informed decision about the fairness of the allocation proposal. We have already held that the district court did not abuse its discretion in finding that the allocation plan was fair, adequate, and reasonable. We affirm the decision of the district court.

AFFIRMED.