424 F.3d 158
 In re HOLOCAUST VICTIM ASSETS LITIGATION
Pink Triangle Coalition, Karl Lange and Pierre Seel, Interested-Party-Appellants,
v.
Union Bank of Switzerland, Swiss Bank Corp., also known as Swiss National Bank, Banking Institutions # 1-100, John Does # 1-100, Certain Swiss Bank Accounts described as follows, Swiss Bankers Assoc., Swiss Bankers Association and Bank of International Settlements, Defendants-Appellees,
Polish American Defense Committee, Inc., a non-profit California Corporation, Irving Wolf, Disability Rights Advocates and Director of International Affairs and Representative to the United Nations of Agudath Israel World Organization, Movants,
Judah Gribetz, Special Master,
 Gizella Weisshaus, on behalf of herself and all other persons of all national origins, ethnic groups, races, creeds and colors, similarly situated as victims and survivors of the Nazi Holocaust, Jacob Friedman and Samuel J. Dubbin, Plaintiffs,
World Jewish Restitution Organization, South Florida Holocaust Coalition and Thomas Weiss, Intervenor-Plaintiffs,
Washington State Insurance Commissioner, Gregory Tsvilichovsky, Matvey Yentus, Sofiya Bloshteyn, Olga Tsvilikhovskya, Larisa Ryabaya, Rosa Yentus, Pavel Aronov, Lubov Starodinskaya, Eliazar Bloshteyn and Plaintiff's Executive Committee Settlement Class, Interested-Parties.
Docket No. 04-2511-CV.
 United States Court of Appeals, Second Circuit.
 Argued: May 16, 2005.
 Decided: September 9, 2005.
 
 Frederick T. Davis, Shearman & Sterling LLP, New York, N.Y. (Irina Dragulev, M. Asher F. Richelli, Vikram Sidhu, Shearman & Sterling LLP, New York, NY; Susan Sommer, Lambda Legal Defense and Education Fund, New York, NY) for Appellants.
 Burt Neuborne, New York, N.Y. (Melvyn I. Weiss, Deborah M. Sturman, Milberg Weiss Bershad & Schulman LLP, New York, NY; Morris A. Ratner, Caryn Becker, Lieff Cabraser Heimann & Bernstein, LLP, New York, NY) for Appellees.
 Before: MESKILL, NEWMAN, and CABRANES, Circuit Judges.
 JOSÉ A. CABRANES, Circuit Judge.
 
 
 1
 Two named individuals and the Pink Triangle Coalition ("PTC"), a consortium of international gay and lesbian organizations, appeal from the orders of the United States District Court for the Eastern District of New York (Edward R. Korman, Chief Judge) entered on April 2, 2004 and May 20, 2004. In its orders, the District Court declined to adopt the PTC's proposal for the allocation of the historic settlement of Holocaust victims' class actions against Swiss banks. The PTC objected to the District Court's allocation of certain settlement funds for the benefit of destitute Holocaust survivors on the ground that, for a series of historical reasons, extremely few victims of Nazi persecution of homosexuals can be identified.[1] As an alternative, the PTC proposed that 1% of the settlement fund be set aside for, inter alia, scholarly, educational, and outreach efforts related to Nazi persecution of homosexuals. The District Court overruled the PTC's objection and declined to adopt its accompanying proposal on the ground that priority in settlement fund distributions should be accorded to identifiable needy Holocaust survivors. We now hold that, in doing so, the District Court acted well within its discretion, and we affirm the Court's orders.
 
 BACKGROUND
 
 2
 This appeal arises from the District Court's allocation and distribution of the historic settlement fund in the Holocaust Victim Assets Litigation, which consolidated several class actions by Nazi persecution victims against Swiss banks. Three other appeals from the District Court's allocation and distribution orders were argued in tandem with appellants' — one brought by, inter alia, organizations representing persons with disabilities (No. 04-2466), represented here by the Disability Rights Associates ("DRA"); another brought by, inter alia, the Holocaust Survivors Foundation-U.S.A., Inc. ("HSF") (No. 04-1898); and a third brought by Samuel J. Dubbin (No. 04-1899). We adjudicate these appeals in separate opinions filed today. See In re Holocaust Victim Assets Litig., ___ F.3d ___ (2d Cir.2005) (DRA appeal); In re Holocaust Victim Assets Litig., ___ F.3d ___ (2d Cir.2005) (HSF appeal); In re Holocaust Victim Assets Litig., ___ F.3d ___ (2d Cir.2005) (Dubbin appeal). In the opinion addressing the HSF's appeal, we summarize the claims underlying the Holocaust Victim Assets Litigation and its procedural history. See In re Holocaust Victim Assets Litig., ___ F.3d at ___ - ___. We assume familiarity with that summary and highlight here only those background events directly relevant to this appeal.
 
 
 3
 In August 1998, the parties to the Holocaust Victim Assets Litigation agreed in principle to release defendant banks and certain other Swiss entities from liability in exchange for the creation of a $1.25 billion settlement fund "explicitly designed to benefit Jews, homosexuals, Jehovah's Witnesses, the disabled and Romani — groups recognized by the United Nations as having been the targets of systematic Nazi persecution on the basis of race, religion or personal status." In re Holocaust Victim Assets Litig., 105 F.Supp.2d 139, 142 (E.D.N.Y.2000). Four of the five classes designated in the settlement agreement and certified by the District Court — Deposited Assets Class, Looted Assets Class, Slave Labor Class I, and Refugee Class — consist of members of these persecuted groups and their heirs.[2] Id. at 143-44. On August 9, 2000, the District Court entered a final order and judgment approving the settlement agreement. In re Holocaust Victim Assets Litig., No. CV 96-4849 (E.D.N.Y. Aug. 9, 2000).
 
 
 4
 On November 22, 2000, the District Court also approved a plan for the allocation and distribution of settlement funds developed by Special Master Judah Gribetz. See In re Holocaust Victim Assets Litig., 2000 WL 33241660 (E.D.N.Y. Nov. 22, 2000), 2000 U.S. Dist. LEXIS 20817. Of the $1.25 billion fund, $800 million was allocated to "the Deposited Assets Class, which is composed largely of heirs of victims of Nazi persecution who deposited funds in Swiss banks." In re Holocaust Victim Assets Litig., 302 F.Supp.2d 89, 91 (E.D.N.Y.2004). Under the plan, the remainder of the fund is to be shared principally by the other four settlement classes. Because the distribution of $100 million allocated to the Looted Assets Class was not susceptible to individualized claims or to a meaningful pro rata distribution, the Court adopted "a cy pres remedy targeting the neediest survivors in the Looted Assets Class."[3] Id. at 96 (emphasis added). Ninety percent of this cy pres remedy was earmarked for needy Jewish survivors, and ten percent for needy Roma, Jehovah's Witness, disabled, and homosexual survivors. Id. at 97.
 
 
 5
 In 2001, the PTC submitted to the Special Master a proposal for "a cy pres allocation of one percent (1%) of the total settlement as an appropriate means of publicly acknowledging the suffering of homosexuals as a class under the Nazis and as an instrument to advance the prevention of human rights abuses based on sexual orientation from happening again." Pink Triangle Coalition, Proposal for a Cy Pres Allocation for Homosexual Victims of the Nazis 5 (Nov. 7, 2001) (submitted to Special Master Judah Gribetz). The proposal included a detailed account of the persecution suffered by members of the gay and lesbian community at the hands of the Nazi regime. Id. at 9-23. The following is but a brief summary of the facts recounted in the PTC's proposal:
 
 
 6
 From their early public statements about homosexuality in the late 1920s, through their assumption of power in 1933, and until their defeat in 1945, the Nazis attempted to systematically eradicate homosexuality from the German nation by outlawing, stigmatizing, and persecuting expressions of homosexuality. The Nazi regime's campaign to eradicate homosexuality began with the destruction of research centers, cultural resources, business establishments, communications media, and community organizations throughout Germany. It led to the arrest and imprisonment of approximately 50,000 homosexual men, the deportation of 5,000 to 15,000 homosexual men to slave labor and concentration camps, the subjection of an undetermined number of homosexual male internees to heinous medical experiments, and finally the outright murder of an estimated 3,000 to 9,000 homosexual men identified and interned as such.
 
 
 7
 Id. at 10 (footnote omitted).
 
 
 8
 The PTC's proposal also underscored the challenges of locating gay and lesbian Holocaust survivors, as well as the historical roots of these challenges:
 
 
 9
 After 1945, the circumstances encountered by homosexual survivors of Nazi persecution are unique because homosexual men continued to be singularly and intensively pursued, imprisoned, and persecuted in West Germany and Austria under the same legal codes used by the Nazis until as late as 1969 and 1971, respectively. Survivors were publicly stigmatized, harassed, silenced, and re-imprisoned; they were excluded from compensation and ignored by elected officials for more than forty years.
 
 
 10
 As a consequence, very few homosexual victims have come forth to seek compensation or claim assets. Moreover, due to the fear of being re-imprisoned, many of the victims did not disclose their homosexuality to their families or the state. Given the post-1945 climate for homosexual victims, it is more than reasonable to presume that many did not inform their families about their sexual orientation and many more did not or were not able to have families of their own. Similar to many of the victims with disabilities, the majority of homosexual victims in all likelihood did not have heirs, successors, administrators, executors, or other affiliates who could act on their behalf.
 
 
 11
 The first political acknowledgement of the injustice of Nazi atrocities perpetrated against homosexuals did not come until nearly half a century after the crimes occurred. Homosexual victims were not even mentioned in memorials and museum exhibits at the concentration camps until the mid-1980s. Finally, homosexual victims had no extended familial, social and organizational networks outside of Germany such as those relied on by victims from religious or ethnic groups which could advocate on their behalf and contribute to the formation of a collective memory of the state-sponsored crimes of which they had been victims.
 
 
 12
 Id. at 29 (footnote omitted).
 
 
 13
 Arguing that "the overwhelming majority of the individual victims will never be able to come forward and claim their due compensation under the Swiss banks settlement," id. at 30, the PTC proposed to use the cy pres allocation it had requested to support the following four initiatives:
 
 
 14
 (1) Providing material assistance to needy homosexual survivors of Nazi persecution, including those who have not come forward for compensation under the current suit.
 
 
 15
 (2) Supporting scholarly research aimed at more fully documenting the anti-homosexual crimes committed by the Nazi regime and at locating additional survivors of anti-homosexual persecution by the Nazis.
 
 
 16
 (3) Promoting the education of students and the general public about the Nazi persecution of homosexuals. Such efforts might include, but are not limited to, curriculum development projects; websites; historical exhibits; public monuments; and the identification, preservation, and interpretation of historic sites.
 
 
 17
 (4) Advancing efforts to prevent anti-homosexual persecution throughout the world today by supporting a diversity of educational, outreach, and awareness programs.
 
 
 18
 Id. at 5.
 
 
 19
 On January 5, 2002, the PTC moved in the District Court for the cy pres distribution recommended in its proposal. The District Court denied the PTC's motion on March 5, 2002, without prejudice to renewal in the event of a second plan of distribution.
 
 
 20
 On September 25, 2002, the District Court ordered, pursuant to the Special Master's recommendation, certain supplemental allocations to settlement classes. In re Holocaust Victim Assets Litig., No. CV 96-4849 (E.D.N.Y. Sept. 25, 2002). These included an additional $45 million allocation to the Looted Assets Class for distribution in accordance with the cy pres principles that governed the initial $100 million allocation. Id., slip op. at 2.
 
 
 21
 On October 2, 2003, the Special Master reported to the District Court that over $485 million of the $1.25 billion fund had been "awarded through direct payments or humanitarian assistance to nearly a quarter of a million class members, the vast majority of whom are surviving victims of Nazi persecution; the other recipients are the heirs of owners of Swiss bank accounts" who received distributions as members of the Deposited Assets Class. In re Holocaust Victim Assets Litig., Special Master's Interim Report on Distribution and Recommendation for Allocation of Excess and Possible Unclaimed Residual Funds, No. CV 96-4849, at 23-24 (E.D.N.Y. Oct. 2, 2003) ("Special Master's Interim Report"). Of that amount, $145 million had been allocated to the Looted Assets Class and "distributed to or reserved for future disbursements by multi-year programs," that offer "food, medicine, shelter and similar assistance" to needy Holocaust victims. Id. at 18, 23. The Special Master's Interim Report also noted that the International Organization for Migration ("IOM"), which oversees the distribution of settlement funds to homosexual, Roma, Jehovah's Witness, and disabled victims of Nazi persecution, see In re Holocaust Victim Assets Litig., 302 F.Supp.2d at 102, "continues to consult with experts and non-governmental organizations as to how best to locate and serve needy . . . homosexual Nazi victims," Special Master's Interim Report at 105. Despite having contacted fifty "homosexual NGOs, foundations, and organizations which work in this community throughout Europe," the IOM experienced "extremely limited" success in locating victims of Nazi persecution against homosexuals. Id. at 105 n. 147.
 
 
 22
 The Special Master proposed that an additional $60 million, attributable primarily to interest income accruing on the settlement fund, be allocated to the Looted Assets Class for "distribution . . . in accordance with the cy pres principles that have successfully governed the administration of" the previous $100 million and $45 million allocations to that class. Id. at 3-4 & n. 4. The Special Master also recommended that the District Court invite proposals for the allocation and distribution of "any unclaimed amounts that might remain from the up to $800 million allocated to the Deposited Assets Class, of which approximately $668.5 million remain[ed] as of the date of the [Special Master's Interim] report." Id. at 13. In an order filed November 17, 2003, the District Court adopted the Special Master's recommendations. In re Holocaust Victim Assets Litig., No. CV 96-4849 (E.D.N.Y. Nov. 17, 2003).
 
 
 23
 On December 19, 2003, the PTC submitted a joint (1) objection to the Special Master's October 2, 2003 allocation recommendation and (2) proposal in response to the Special Master's inquiry regarding the future allocation of unclaimed funds. "[O]n behalf of homosexual victims of the Third Reich, nearly all of whom are now impossible to identify," the PTC objected to the Special Master's proposed "distribution of all residual unclaimed funds only to identified needy living Holocaust victims." The PTC again proposed a cy pres allocation of one percent of the settlement fund to support the four initiatives it had previously advanced.
 
 
 24
 In a memorandum and order of April 2, 2004, the District Court overruled the PTC's objection and declined to adopt the PTC's proposal. In re Holocaust Victim Assets Litig., 311 F.Supp.2d 407, 409 (E.D.N.Y.2004). The District Court reasoned that "a separate distribution to remembrance and education programs dedicated to homosexual victims of the Nazis" was not warranted for three reasons. Id. at 416. First, homosexual "victims are only entitled to such distributions as individuals — not as a group." Id. at 417. Second, "and more importantly," the Court stated that it was unable to justify the $12.5 million allocation advocated by the PTC "given the current level of need experienced by individual members of the Looted Assets Class," such as the "135,000 identified destitute Jewish survivors in the Former Soviet Union alone, many of whom are in danger of starving without continued assistance." Id. Finally, the Court cautioned against assuming that homosexual survivors "have not received a proportionate share of the total distributions in this case." Id. The Court noted that some of the survivors who received funds on the basis of their membership in other victim groups may "have been homosexual, even if not explicitly identified or targeted by the Nazis as such." Id. In addition, the Court cited "a clear record of awards" in the Deposited Assets Class "being made based on accounts once held by homosexual victims of Nazi persecution" and noted that homosexual partners have been recognized as heirs in the claims process. Id. The Court concluded that "[b]ecause so many survivors continue to face life-threatening needs on a daily basis," the "worthy goals" advanced by the PTC cannot "be currently funded by the ever-diminishing settlement fund." Id. at 419 (emphasis added).
 
 
 25
 On May 20, 2004, the District Court filed a memorandum clarifying its April 2, 2004 memorandum and order:
 
 
 26
 The word "currently" appeared to leave open the possibility that at a future date, such programs could be the recipients of money from the settlement fund. But after holding a hearing on April 29, 2004 regarding the distribution of any possible residual funds in this case, and having heard from many members of the survivor community and the organizations that assist them, it is evident that the personal needs among survivors of Nazi persecution for food, winter relief, emergency assistance, medicine and home health care will remain too pressing to justify any future distribution to the [PTC's] proposed programs for research, education, or advocacy. To the extent that my April 2, 2004 memorandum and order left open the possibility that I could reconsider this question at a future date, I now clarify that my decision was final.
 
 
 27
 In re Holocaust Victim Assets Litig., No. CV 96-4849, slip op. at 2 (E.D.N.Y. May 20, 2004).
 
 
 28
 Appellants filed a timely notice of appeal to this Court.
 
 DISCUSSION
 
 29
 As we have held in an earlier appeal related to this litigation, "[t]he district court has broad supervisory powers with respect to the administration and allocation of settlement funds, and we `will disturb the scheme adopted by the district court only upon a showing of an abuse of discretion.'" In re Holocaust Victim Assets Litig., 413 F.3d 183, 185 (2d Cir.2001) (citing Beecher v. Able, 575 F.2d 1010, 1016 (2d Cir.1978), and quoting In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 179, 181 (2d Cir.1987)). Professor Burt Neuborne, the Lead Settlement Counsel in this case,[4] has aptly summarized the reasons for our deferential approach to district court settlement allocation decisions generally, and to the District Court's allocation decisions in this particular litigation:
 
 
 30
 In a complex class action settlement like this one, fraught with difficult legal and moral judgments, someone must make the final choice between and among numerous praiseworthy alternatives. Under [Federal Rule of Civil Procedure 23] and the structure of the Swiss bank settlement agreement, that heavy responsibility falls on the shoulders of the supervising District Judge, whose thoughtful discretionary judgments are entitled to respect and deference in this Court.
 
 
 31
 Lead Settlement Counsel's Br. at 34.
 
 
 32
 That said, the District Court's discretion is not unbounded. We have previously recognized that "[a] district court `abuses' or `exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision — though not necessarily the product of a legal error or a clearly erroneous factual finding — cannot be located within the range of permissible decisions." Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 169 (2d Cir.2001) (footnotes omitted).
 
 
 33
 Before considering whether the District Court exceeded its discretion here, it is helpful to clarify the undisputed factual setting under which that discretion was exercised. Appellants do not contest the District Court's finding that "there are 135,000 identified destitute Jewish survivors in the Former Soviet Union alone, many of whom are in danger of starving without continued assistance." In re Holocaust Victim Assets Litig., 311 F.Supp.2d at 417. It is likewise undisputed that identifying "survivors of Nazi persecution who were targeted for victimization because they were homosexual" has proven to be "extremely difficult." Id. at 412. Less than a dozen such individuals have been identified, and only seven of these can be described as "needy," such that they may benefit from the cy pres allocation of Looted Assets Class funds. See id. ("[The PTC] itself has only identified seven living needy survivors who were targeted by the Nazis on account of their sexual orientation."). Finally, appellants have not alleged — nor has our independent review of the record of this case revealed — any deficiencies in the District Court's efforts to identify surviving victims of Nazi persecution against homosexuals.
 
 
 34
 Appellants argue that under these circumstances — where extensive efforts to locate victims of Nazi persecution against homosexuals have yielded only a handful of individuals — the District Court "lacked discretion" to allocate residual settlement funds solely for the benefit of needy Holocaust survivors.[5] Appellants' Reply Br. at 13-14. In other words, appellants contend that so few victims of Nazi persecution against homosexuals have been located that the District Court was obligated to take the further steps of allocating funds for scholarly, educational, and outreach efforts proposed by the PTC. See Appellants' Reply Br. at 4-5 (arguing that "the only" allocation properly within the District Court's discretion is the "modest cy pres allocation requested under the PTC proposal") (emphasis in original). For the following reasons, we disagree.
 
 
 35
 First, we conclude that the District Court's decision did not "rest[] on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding." Zervos, 252 F.3d at 169. Appellants argue that courts have previously used cy pres principles, inter alia, to approve charitable donations "`to organizations geared towards combating harms similar to those that injured the class members.'" Appellants' Br. at 35 (quoting In re Motorsports Merch. Antitrust Litig., 160 F.Supp.2d 1392, 1394 (N.D.Ga.2001)). We are, however, aware of no authority — and appellants provide none — that compels a court to make a cy pres allocation to organizations combating harms similar to those that injured the class members when an alternative allocation benefits the class members themselves. At most, the case law on which appellants rely suggests that the District Court may have had the discretion to adopt the PTC's proposal. Under our deferential standard of appellate review, this is not enough to overturn the District Court's ruling; rather, appellants must show that the District Court lacked the discretion to reject the PTC's proposal.
 
 
 36
 For similar reasons, we are not persuaded by the appellants' reliance on In re "Agent Orange" Product Liability Litigation, where we concluded that "the district court may in the exercise of its discretion and after consultation with [victims'] groups undertake to use portions of the fund for class assistance programs that are consistent with the nature of the underlying action and with the judicial function." 818 F.2d at 186. Appellants emphasize that, in Agent Orange, the district court subsequently approved the funding of several remedial programs, including "an information-referral network; aid to the children of exposed veterans, particularly to those children suffering from birth defects; aid to homeless veterans; genetic counseling; legal aid; social work and counseling; employment assistance; substance abuse treatment; post-traumatic stress disorder (PTSD) treatment; and diverse local community assistance grants." In re "Agent Orange" Prod. Liab. Litig., 689 F.Supp. 1250, 1270-71 (E.D.N.Y.1988); see also Appellants' Reply Br. at 25-26. Appellants now argue that the District Court erroneously rejected the PTC's proposal because it failed to follow the "appropriate general model" established by the Agent Orange settlement. Id. at 26.
 
 
 37
 We disagree. First, we are unpersuaded that the PTC's cy pres proposal is as "consistent with the nature of the underlying action" as the program authorized by the district court in Agent Orange. More importantly, even assuming arguendo that the two programs were similarly related to underlying class claims, appellants offer no authority for their argument that the allocation of the Agent Orange settlement provides a "general model," much less a mandatory general model. Once again, the most generous reading of appellants' argument is that the District Court had the legal authority to adopt the PTC's proposal. For appellants to prevail on appeal, they must also persuade us that the District Court was legally compelled to adopt that proposal.
 
 
 38
 Accordingly, we find no error of law in the District Court's decision to overrule the PTC's objection and reject its proposal. Appellants have not suggested — and our independent examination of the record of this case does not reveal — that the District Court reached its conclusions on the basis of any clearly erroneous factual finding. We are thus left to inquire whether the District Court's allocation of funds in this case — "though not ... the product of a legal error or a clearly erroneous factual finding" — still "cannot be located within the range of permissible decisions." Zervos, 252 F.3d at 169.
 
 
 39
 On this score, appellants urge that the District Court's decision not to adopt the PTC's proposal violates the "principles underlying" the settlement agreement by largely excluding homosexuals, one of the groups targeted by Nazi persecution, from compensation. Appellants' Br. at 28. According to appellants, "the only" appropriate compensation of homosexual victims is the funding of scholarly, educational, and outreach programs sought by the PTC. Id. at 28, 39 (emphasis in original); Appellants' Reply Br. at 4-5.
 
 
 40
 The District Court concluded that this argument rests on a fatal "conceptual flaw" — the assumption that there is a "homosexual victims' share" of the settlement fund. In re Holocaust Victim Assets Litig., 311 F.Supp.2d at 416-17. As the Court explained, the PTC correctly recognized that victims of Nazi persecutions of homosexuals
 
 
 41
 are entitled to distributions through the Looted Assets Class and each of the other classes. But these victims are only entitled to such distributions as individuals — not as a group. There are no sub-classes within the Looted Assets Class or any other class.... All victims of the Nazis were presumed looted, and all had an equal right to allocation through the Looted Assets Class. Put differently, the original purpose was to provide restitution to each individual victim, irrespective of why he or she was targeted by the Nazis; thus, the allocation to the Looted Assets Class will be successful or unsuccessful based on how much meaningful restitution it can provide to members of the class, regardless of whether it perfectly reflects the target group breakdown of Nazi victims.
 
 
 42
 Id. (emphasis added). We fully agree with the District Court's reasoning. Having carefully reviewed the record of this case, we find no support for the proposition that a group entitlement to a particular share of the settlement fund had ever been contemplated, much less established.
 
 
 43
 Appellants nonetheless argue that "the focus on compensation to groups ... permeates" the allocation of the settlement, relying principally on the fact that 90% of cy pres funds allocated to the Looted Assets Class had been earmarked for needy Jewish persecution victims and 10% for needy non-Jewish victims. Appellants' Br. at 41 (emphasis in original); see also In re Holocaust Victim Assets Litig., 302 F.Supp.2d at 97. Contrary to appellants' suggestion, the 90/10 formula was not adopted with the purpose of vesting group-based legal entitlements. Rather, as the Lead Settlement Counsel correctly explains, the formula was "merely an administrative mechanism for channeling the funds to appropriate social agencies based on the estimated number of eligible victims," a mechanism made expedient because "social agencies that deliver aid to the victims are often correlated with the victim[s'] group identity." Lead Settlement Counsel's Br. at 42; see generally In re Holocaust Victim Assets Litig., Special Master's Proposed Plan of Allocation and Distribution of Settlement Fund, No. CV 96-4849, at 118-19 (E.D.N.Y. Sept. 11, 2000) ("Special Master's Proposal") (discussing the bases for the 90/10 formula). In other words, the 90/10 formula permitted the District Court to utilize social agencies with experience in serving particular communities for the day-to-day distribution of funds to needy individual victims.[6] This administrative process took advantage of existing community ties to facilitate the distribution of funds to individual victims, but we find no evidence that this process vested any rights in the relevant communities themselves.
 
 
 44
 Appellants also point out that "the Nazis specifically targeted particular groups for persecution." Appellants' Reply Br. at 18. This is not only an undisputable historical fact, but the cornerstone of the Swiss bank settlement, which was intended to benefit members of "groups recognized by the United Nations as having been the targets of systematic Nazi persecution on the basis of race, religion or personal status." In re Holocaust Victim Assets Litig., 105 F.Supp.2d at 143. Yet we are unpersuaded by the inferences appellants draw from the Nazi practice of targeting members of particular groups for persecution. This tragic history in no way strips the District Court of the discretion to accord priority to needy individual survivors rather than to scholarly, educational, and outreach programs.
 
 
 45
 Finally, appellants allege that "[b]y not providing for any real distribution from the settlement funds to homosexual victims as such, the District Court joined the long-standing historical refusal to recognize the suffering of thousands of homosexuals who remained forgotten victims of Nazi persecution for decades after the end of the Third Reich." Appellants' Br. at 33. We emphatically note that nothing in the record of this case supports this assessment of the District Court's actions. In addressing the PTC's objection and proposal, the District Court unambiguously stated, as it had done throughout the proceedings, that the "terrible history" of the Nazi regime's persecution of homosexuals "places homosexual survivors squarely within the definition" of the settlement's beneficiaries. 311 F.Supp.2d at 413. Indeed, appellants themselves assert in their appellate brief that this litigation "led to the first-ever legal recognition that gay people were systematically persecuted by the Nazis." Appellants' Br. at 33 n. 9. Although the District Court concluded that payments to needy Holocaust survivors take priority over the scholarly, educational, and outreach programs proposed by the PTC, it never underplayed the suffering caused by Nazi persecutions against homosexuals.
 
 CONCLUSION
 
 46
 For over six years, Judge Korman and Special Master Gribetz have pursued the monumental challenge of allocating limited funds among the victims of a limitless tragedy. Although appellants agree that the District Court's task is "unenviable," id. at 29, they nonetheless contend that the Court erroneously rejected the PTC's request for settlement funds to support, inter alia, scholarly, educational, and outreach programs. We now hold that the District Court acted within its discretion by rejecting the PTC's proposal and concluding that the neediest among the identifiable survivors — be they Jewish, homosexual, Jehovah's Witnesses, disabled or Romani — must first be brought some comfort in the final years of their lives.
 
 
 47
 Accordingly, the District Court's orders of April 2, 2004 and May 20, 2004 are hereby affirmed.
 
 
 
 Notes:
 
 
 [1]
 Because the settlement agreement used the term "homosexual" in its definition of "Victims or Targets of Nazi Persecution,"see note 2, post, we use it interchangeably with "gay and lesbian."
 
 
 [2]
 As we have previously explained, the settlement agreement
 defines "Victims or Targets of Nazi Persecution" as those persons "persecuted or targeted for persecution by the Nazi Regime because they were or were believed to be Jewish, Romani, Jehovah's Witness, homosexual, or physically or mentally disabled or handicapped." This definition reflects the parties' agreement that the Settlement should benefit persons targeted for persecution "on grounds of race, religion, or personal status." The Settlement divides the plaintiff class into five subclasses, four of which are limited to "Victims or Targets of Nazi Persecution." A fifth subclass, "Slave Labor Class II," covers any individual . . . who performed slave labor for an entity "headquartered, organized, or based in Switzerland."
 In re Holocaust Victim Assets Litig., 225 F.3d 191, 194 (2d Cir.2000).
 
 
 [3]
 As the Eight Circuit recently explained,
 [t]he cy pres doctrine takes its name from the Norman French expression, cy pres comme possible, which means "as near as possible." The doctrine originated to save testamentary charitable gifts that would otherwise fail. Under cy pres, if the testator had a general charitable intent, the court will look for an alternate recipient that will best serve the gift's original purpose. In the class action context, it may be appropriate for a court to use cy pres principles to distribute unclaimed funds. In such a case, the unclaimed funds should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated.
 In re Airline Ticket Comm'n Antitrust Litig., 307 F.3d 679, 682-83 (8th Cir.2002) (internal citations omitted). We have previously approved a district court's allocation, pursuant to the cy pres doctrine, of settlement funds to those class members "`most in need of help.'" In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 145, 158 (2d Cir.1987).
 
 
 [4]
 Although the Lead Settlement Counsel, Professor Neuborne of New York University Law School, does not represent any party in the context of these appeals, he has played a number of important roles in this litigation, both as a representative of the plaintiffs and as "something of a general counsel to the administration of the settlement fund."In re Holocaust Victim Assets Litig., No. CV 96-4849, slip op. at 3 (E.D.N.Y. Sept. 13, 2004). The District Court has authorized the Lead Settlement Counsel to provide "an adversarial defense" of the District Court's position in this Court. Id., slip op. at 1.
 
 
 [5]
 Lead Settlement Counsel challenges the PTC's standing to appeal the District Court's orders. Because the question of the PTC's standing was not raised before, or addressed by, the District Court, we would ordinarily remand this cause for a determination of PTC's standing. Such a remand is not necessary here, however, since we are satisfied that the individual appellants have alleged facts sufficient to establish their standing, and Lead Settlement Counsel does not suggest otherwiseSee Bennett v. Spear, 520 U.S. 154, 168, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (allegation of facts sufficient to show standing suffices to withstand motion to dismiss).
 
 
 [6]
 For example, the American Jewish Joint Distribution Committee was asked to distribute funds to needy Jewish Holocaust survivorsSee In re Holocaust Victim Assets Litig., 302 F.Supp.2d at 99.