OPINION OF THE COURT
Shirley Werner Kornreich, J.
This action and a related case in the federal court, In re MetLife Demutualization Litig. (US Dist Ct, ED NY, 00 CV 2258, Weinstein, J.), are class actions arising from the April 2000 conversion of Metropolitan Life Insurance Company (Metlife) from a mutual insurance company to a stock corporation (demutualization), pursuant to Insurance Law § 7312. The New York class consists of all eligible policyholders of Metlife who owned insurance policies as of September 28, 1999. Metlife, its officers, directors and affiliates were excluded from the class.[1] On October 15, 2009, Judge Weinstein appointed Richard J. Da *601 vis, Esq., a member of the firm of Weil, Gotshal & Manges LLP, to mediate both the federal and state actions. Through the efforts of Special Master Davis, the parties arrived at a proposed settlement.
The parties now seek final approval of that proposed settlement. Plaintiffs’ counsel also have applied for attorneys’ fees and expenses, and named plaintiffs have applied for compensation for the time and effort they expended on the case, all to be paid from the settlement fund. In addition, counsel for one of the objectors to the settlement, who eventually withdrew his objection, has applied for fees.
After notice and hearing and for the reasons which follow and as explained in the parallel federal memorandum, order and judgment, the proposed settlement is found to be fair, reasonable and adequate as to the parties and all persons directly or indirectly affected by it. Fees and expenses, as awarded, are approved as fair, reasonable and supported by the record. Moreover, named plaintiffs’ applications for compensation are approved in part and denied in part. Disposition of the approved settlement amounts is properly provided for.
I. Facts
A. Background
The facts of this case and the federal case have been detailed in prior decisions (Shah v Metropolitan Life Ins. Co., 2003 NY Slip Op 50591[U] [Sup Ct, NY County 2003], mod 6 AD3d 320 [1st Dept 2004]; Fiala v Metropolitan Life Ins. Co., 2006 NY Slip Op 30068[U] [Sup Ct, NY County 2006], mod 52 AD3d 251 [1st Dept 2008]; Fiala v Metropolitan Life Ins. Co., 17 Misc 3d 1102[A], 2007 NY Slip Op 51797[U] [Sup Ct, NY County 2007]; In re MetLife Demutualization Litig., US Dist Ct, ED NY, 00 CV 2258, docket No. 537, Oct. 30, 2009 [order regarding motions in limine]; In re MetLife Demutualization Litig., US Dist Ct, ED NY, 00 CV 2258, docket No. 501, Oct. 16, 2009; In re MetLife Demutualization Litig., 624 F Supp 2d 232 [ED NY 2009]; In re MetLife Demutualization Litig., 262 FRD 205 [ED NY 2009]; In re MetLife Demutualization Litig., US Dist Ct, ED NY, 00 CV 2258, docket No. 540, Nov. 11, 2006; In re MetLife Demutualization Litig., 229 FRD 369 [ED NY 2005], petition for interlocutory appeal denied No. 05-8020 [2d Cir 2009]; In re Metlife Demutualization Litig., 322 F Supp 2d 267 [ED NY 2004]; In re MetLife Demutualization Litig., 156 F Supp 2d 254 [ED NY 2001]) and in the parallel, particularized memorandum, order *602 and judgment of Judge Weinstein. Familiarity with the facts is presumed.
Briefly, however, it is important to note that: the demutualization, pursuant to Insurance Law § 7312 (d) (4), was unanimously approved by Metlife’s Board of Directors, the majority of whom were not officers of Metlife and had no financial interest in the demutualization; more than 93% of the voting policyholders approved the demutualization after being sent, inter alia, a policyholder booklet summarizing the plan and containing the plan itself; and that the New York Superintendent of Insurance approved the information sent to the policyholders and, subsequent to the entire process and a public hearing, determined the demutualization plan was in the best interests of Metlife and its policyholders, did not violate the law, was fair and equitable and would leave Metlife with sufficient capital and surplus for future solvency. The Superintendent had access to all documents and relied upon his own legal, financial, actuarial and accounting advisors, who reviewed all aspects of the decisionmaking, in reaching these determinations.[2] Also essential to this opinion is the portion of the demutualization plan which established an accounting mechanism known as a “closed block” for the purpose of ensuring “the reasonable dividend expectations of policyholders.” (Demutualization plan § 3.1 [a]; § 8.1.) In the end, after a lengthy, hard-fought litigation, the state case devolved on one insurance law issue — the failure to disclose to the policyholders an alleged plan to issue excess shares and buy them back after the initial public offering (IPO). The federal and state parties agreed to the proposed settlement at the start of trial in the federal action and while a summary judgment motion was pending in the state action.[3] During the nearly 10 years of litigation, motions were made and appeals *603 taken, hundreds of thousands of documents were exchanged, more than 50 depositions were held and experts were retained.
B. Terms of Proposed Settlement
The proposed settlement provides for a total payment of $50 million by defendants to resolve both the federal and state cases. Two million, five hundred thousand dollars is to be remitted as a cy pres payment to a health-based, not-for-profit organization, up to $15 million is to be paid as counsel fees, disbursements and as incentive compensation to the named parties, and the remainder is to be allocated to the closed block as established by the demutualization plan. The $2.5 million is for the benefit of those former policyholders who are not part of the closed block. The settlement releases all claims of the named plaintiffs, claims of the more than 10 million class members and other claims related to the demutualization.[4]
C. Notice of Settlement
Notice by publication was approved by order of this court and separate order of the federal court. Notice, as ordered, was published in the New York Times, the Wall Street Journal, the New York Law Journal and USA Today on November 12, 13, 17 and 19, 2009. The form of notice and stipulation of settlement were made available on the federal courts’ Web site and could be picked up at the federal and state courthouses. Further, notice was given to the Superintendent of Insurance. A joint hearing as to the fairness of the proposed settlement was scheduled for December 30, 2009. Written objection to the proposed settlement was to be received by December 24, 2009, and five objections on behalf of six class members ultimately were received. The objections were made on behalf of: Robert A. Gould; Lawrence Kuczynski; Thomas Sterrett Bell and John J. Pentz, Jr.; Christopher Mueller; and Steven Waldman.
*604 Mr. Gould objected to the settlement because class “members who no longer obtain a benefit from the closed block receive no benefit from the settlement.” However, he also objected to the cy pres set-aside of the portion of the settlement intended for the benefit of non-closed-block class members. Mr. Kuczynski’s objection pointed to Metlife’s former ownership of Stuyvesant Town and Peter Cooper Village and stated that this fact was not adequately disclosed. Mr. Bell and Mr. Pentz objected to the class notice and the failure to certify a subclass of policyholders who do not benefit from the closed block. Mr. Mueller objected to the amount of the settlement in light of the damages asserted in the complaints and to the policy of demutualization. Mr. Waldman objected to Metlife’s alleged unfettered discretion in choosing the assets allocated to the closed block and the administration of those assets once in the closed block.
Metlife answered the objections of Mr. Gould, Mr. Bell and Mr. Pentz, pointing out that the non-closed-block class members are represented in the state action by Mr. Shah, who no longer owns a policy, and in the federal action by Ms. DeVito, a former policyholder. It argued in support of the cy pres payment that it was set aside to benefit the non-closed-block class members, who were difficult to locate and had the opportunity to object when notice was disseminated by publication. Metlife also argued that Mr. Kuczynski’s objection was not compelling, since he suggested no reason why the past ownership of Stuyvesant Town and Peter Cooper Village is relevant.
In addition, as to Mr. Mueller’s objections, Metlife argued that a settlement cannot be assessed based upon the complaints’ alleged damages. Rather, it contended, the court must look at the strength of the plaintiffs’ case. Metlife further argued that plaintiffs, in fact, suffered no monetary damage and that Mr. Mueller’s objection to demutualization is a policy argument rejected by New York State. Finally, Metlife refuted Mr. Wald-man’s claims that Metlife had unfettered discretion in its selection of assets to be contributed to the settlement and the administration of the closed block. Metlife noted that the stipulation of settlement “requires the assets to be valued at their ‘current market value as calculated by Metlife,’ ” that the rules of the New York Insurance Department require that “assets added to the closed block be valued either by established public markets or through arms’ length third-party valuation,” and that the “Plan of Reorganization requires that the majority of the closed block assets be investment grade quality.” (Defend *605 ant’s mem at 40.) It then argued that the distribution of the closed block assets is governed by the plan of reorganization and calculated annually with the goals of exhausting the assets with the last claim and avoiding buildup and the tontine effect.[5] (Id. at 40-41.)
D. December 30, 2009 Fairness Hearing
A joint hearing was held in the United States Courthouse, Eastern District of New York, in Brooklyn, on December 30, 2009. No representative of the New York Insurance Department appeared. Nor did objectors Robert A. Gould and Lawrence Kuczynski attend. Mr. Bell and Mr. Pentz, objectors in the federal action, were heard through counsel. Mr. Waldman, also through his attorney, withdrew his objection, contending that improvements to the settlement had been made due to his objections. Mr. Mueller was given 10 business days to submit a written statement.
Arguments were heard in support of the settlement by plaintiffs’ counsel for both the federal and state actions and by defendants. Given the large size of the class, the cost savings to the class, in administering the settlement by placing the monies in the closed block and in a cy pres not-for-profit, were highlighted. Finally, the hearing was adjourned to February 9, 2010, Supreme Court, New York County. A press release was issued by Metlife announcing the continuance, and further submissions were to be served and filed by February 5, 2010.
E. February 9, 2010 Continued Fairness Hearing
Objector Steven Waldman’s counsel spoke first, addressing his belief that the Waldman objection improved the settlement by forcing Metlife to specify the funding of the settlement and how the monies would be administered once placed into the closed block. Counsel sought $42,816.50. Waldman’s counsel’s application was opposed by Metlife and class counsel. They argued that the settlement defines the closed block as the closed block established by the demutualization. Thus, the settlement monies paid into the closed block are restricted by the plan and the Insurance Department and have to be administered pursuant to the plan. Counsel, therefore, argued that Waldman’s *606 objection neither affected nor clarified the administration of the settlement monies.
The federal and state class counsel rested on their papers in their requests for attorneys’ fees and disbursements. Further documentation was to he submitted on reimbursements.
Application was made for payment to the four named federal class representatives; $1,500 was requested for each. Submissions for incentive payments were made on behalf of the named state representatives, detailing the time spent by each. Far more remuneration was asked for them than for the federal representatives. In addition, when asked about class representative Shah, his counsel admitted that Mr. Shah purchased his policy close to the date of the demutualization. Metlife’s counsel elaborated on this, stating that Mr. Shah testified at his deposition that he purchased his annuity policy in the smallest amount available, immediately prior to demutualization, as a speculator. Also, protesting payment to class representatives Smilow and Hazen, Metlife noted that Mr. Smilow is a partner in one of the firms serving as lead counsel for the state plaintiffs and that Ms. Hazen was never certified as a class representative. Mr. Smilow and his attorney addressed the court.
The cy pres recipient was named at the hearing as the Foundation for the National Institutes of Health.
II. Conclusions of Law
A. Settlement
CPLR 908 requires court approval of any compromise of a class action. Although the statute does not define the criteria for such approval, New York’s courts have recognized that its class action statute is similar to the federal statute (Matter of Colt Indus. Shareholder Litig., 77 NY2d 185, 194 [1991]; Avena v Ford Motor Co., 85 AD2d 149, 152 [1st Dept 1982]; Friar v Vanguard Holding Corp., 78 AD2d 83, 93 [2d Dept 1980]) and have looked to federal case law for guidance. (Klein v Robert’s Am. Gourmet Food, Inc., 28 AD3d 63 [2d Dept 2006]; Matter of Colt Indus. Shareholder Litig., 155 AD2d 154, 160 [1st Dept 1990], mod on other grounds 77 NY2d 185 [1991].) Hence, court approval is determined by the fairness of the settlement, its adequacy, its reasonableness and the best interests of the class members. (Klein at 73; Rosenfeld v Bear Stearns & Co., 237 AD2d 199 [1st Dept 1997], lv denied 90 NY2d 811 [1997]; see Joel A. v Giuliani, 218 F3d 132, 138 [2d Cir 2000]; Grunin v International House of Pancakes, 513 F2d 114, 123 [8th Cir *607 1975], cert denied 423 US 864 [1975] [settlement should be fair, reasonable and adequate].)
Adequacy requires “balancing the value of that settlement against the present value of the anticipated recovery following a trial on the merits, discounted for the inherent risks of litigation.” (Klein at 73; see Colt Indus., 155 AD2d at 160 [fairness is determined by weighing plaintiffs likelihood of success against settlement offered].) Other factors to be considered are the support of the class members, the opinion of counsel, lack of collusion and counsel’s and class representatives’ adherence to fiduciary standards. (Hibbs v Marvel Enters., Inc., 19 AD3d 232, 233 [1st Dept 2005]; Avena, 85 AD2d at 153; see Klurfeld v Equity Enters., 79 AD2d 124, 133 [2d Dept 1981] [factors to be considered in reviewing class settlement are: likelihood of success, support of parties, judgment of counsel, good faith and nature of law and fact]; Joel A., 218 F3d at 138 [lack of collusion is factor to be considered]; Wal-Mart Stores, Inc. v Visa U.S.A., Inc., 396 F3d 96, 116 [2d Cir 2005] [“A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm’s-length negotiations between experienced, capable counsel after meaningful discovery” (internal quotation marks omitted)].) Consideration of the relevant criteria weigh in favor of approval here.
The instant settlement followed a hard-fought, lengthy litigation consuming nearly 10 years. Experienced and skilled counsel argued numerous motions and appeals and briefed a complex summary judgment motion pending before the court when this action settled. That motion turned on the one remaining argument — plaintiffs’ contention that Metlife failed to disclose an alleged plan to issue excess shares of stock and buy them back after the IPO. Plaintiffs contend that such a plan existed as a means of increasing executive/director compensation, that they were not informed of the plan, that the issuance of excess shares devalued the shares they were given and that the failure to divulge the buyback impacted on their decisions as to whether or not to keep or sell the stock.
However, Metlife denies that such a plan existed. Instead, Metlife contends: that it was considering whether to repurchase stock for licit corporate purposes pursuant to its “business judgment”; that the decisions made by the directors were not made for any self-interested reasons and were divulged; that the Superintendent of Insurance and its advisors had access to all of Metlife’s documents, knew of the possibility of repurchase and, *608 nonetheless, found the demutualization plan in the best interests of Metlife and its policyholders, not violative of the law and fair and equitable; and that Metlife acted to maximize the IPO price. Additionally, Metlife contends that plaintiffs suffered no damage as a result of the repurchase and points to statements by both the federal and state courts that the evidence strongly suggests that the demutualization benefitted the policyholders. (Defendants’ mem at 26.)
Plaintiffs’ position was precarious, given the difficulty in proving that the repurchase plan existed prior to issuing the information booklet and that the repurchase was contemplated as a means of benefitting Metlife directors and executors to the detriment of the policyholders. This was particularly so in light of approval of the plan by the Superintendent. Also, proving monetary damages would have been a difficult challenge for plaintiffs. Accordingly, the risk of losing the summary judgment motion or the trial was great. Moreover, even had plaintiffs succeeded on either or both, an appeal of the decision or verdict was inevitable. Consequently, the complexity of the litigation, its expense and its duration favored settlement for both the plaintiffs and defendants.
Further, the history and length of the litigation speak to the lack of collusion and coercion in negotiating the final settlement. That settlement occurred after comprehensive and meaningful discovery, on the brink of trial and with the help of an accomplished and scrupulous mediator. After appropriate notice[6] to the more than 10 million class members, only five objections were forthcoming. The settlement met with almost universal approval. Counsel and class representatives, who had aggressively sought redress over nearly 10 years, fully supported the settlement. The amount of attorneys’ fees, which is up to the court, has not been determined and is not a factor here.
The court believes, given all of the above circumstances, that the settlement is fair, reasonable and adequate. Placing the settlement funds in the closed block does away with administrative costs and provides a real benefit for those class members in *609 the closed block. Likewise, the money in the cy pres fund fairly provides a benefit for the small portion of the class members not in the closed block.
Cy pres means “as near as possible.” (Ousmane v City of New York, 22 Misc 3d 1136[A], 2009 NY Slip Op 50468[U], *8 [Sup Ct, NY County 2009, Cooper, J.].)[7] In New York, the cy pres doctrine is embedded and often used in the context of charitable gifts and trusts. The doctrine is invoked where the bequest cannot be carried out due to changed circumstance, impracticability or impossibility. (Matter of Post, 2 AD3d 1091, 1092-1093 [3d Dept 2003].) In such circumstance, the court may exercise its cy pres power to redirect the bequest “in such manner as in the judgment of the court will most effectively accomplish its general purposes.” (Id. at 1093 [citations omitted].) The doctrine is applied only after the court makes a finding of impracticality, impossibility or changed circumstance. (Id.)
There is little New York law applying the cy pres rule to class action settlements. (But see Klein, 28 AD3d at 73-74.) Nonetheless, there is no prohibition against employing this well-recognized doctrine, oft applied by the federal courts. (See In re Pharmaceutical Indus. Average Wholesale Price Litig., 588 F3d 24 [1st Cir 2009]; In re Holocaust Victim Assets Litig., 424 F3d 158 [2d Cir 2005]; Airline Ticket Commn. Antitrust Litig., 307 F3d at 682.) It is particularly appropriate here where the federal court and state court have coordinated these closely related cases affecting more than 10 million class members. It would be impossible to go forward with this settlement without the cy pres award. Nor would it be practical to not utilize the cy pres mechanism. Many of the non-closed-block class members would have to be located at great expense; many would not be found. Searching for these class members would have greatly depleted *610 the $2.5 million and left these class members with little benefit. The Foundation for the National Institutes of Health, the cy pres beneficiary, will allocate the funds to national, health-related research projects, an appropriate purpose for these funds.
B. Attorneys’ Fees
1. Class Counsel
CPLR 909 provides that the court may award attorneys’ fees in its discretion. Fees are awarded “based on the reasonable value of legal services rendered.” (CPLR 909.) Unless “justice requires,” fees are paid from the judgment award, not by defendants. (See Loretto v Group W. Cable, 135 AD2d 444, 448 [1st Dept 1987] [attorneys’ fees properly payable out of judgment fund, if any, where justice does not require plaintiffs adversaries, who have at all times acted in good faith, to pay plaintiffs attorneys].)
No single method of determining fees is required, although the lodestar method and the percentage method have been employed. (Flemming v Barnwell Nursing Home & Health Facilities, Inc., 56 AD3d 162, 165 [3d Dept 2008], lv granted 13 NY3d 710 [2009]; see Nager v Teachers’ Retirement Sys. of City of N.Y., 57 AD3d 389 [1st Dept 2008], lv denied 13 NY3d 702 [2009].) Factors to be considered by the court in assessing the fees are: the risks of the litigation, whether counsel had the benefit of a prior judgment, standing at bar of counsel for the plaintiffs and defendants, the magnitude and complexity of the litigation, responsibility undertaken, the amount recovered, the knowledge the court has of the case’s history and the work done by counsel prior to trial, and what it would be reasonable for counsel to charge a victorious plaintiff. (Sheridan v Police Pension Fund, Art. 2 of City of N.Y., 76 AD2d 800, 801 [1st Dept 1980].)
The long history of these cases reflects lengthy, complex litigations, with no precedential decisions in similar cases. The actions, when brought, presented substantial risk to counsel. Counsel for both plaintiffs and defendants were skilled and highly experienced. As a result, the actions were hard-fought, spawning thousands of pages of discovery and multiple motions and appeals.
State and federal counsel here have submitted a joint request for fees and reimbursements totaling $15 million. They also have submitted the hours spent by the attorneys and paralegals *611 on the litigation from its inception in 2000 until settlement in 2009 arid the rates of each individual lawyer and paralegal. Multiplying these hours by their hourly rates (the lodestar method) yields a total of $42,824,818.25. This figure far surpasses the request of counsel.
Moreover, the $15 million fee request, when the expenses of about $4.5 million are deducted, amounts to 21% of the settlement. As explained in Judge Weinstein’s well-reasoned decision in the parallel federal case, this percentage is consistent with statistical trends in class action fee awards as reflected in a recent empirical study (Theodore Eisenberg and Geoffrey P. Miller, Attorneys’ Fees and Expenses in Class Action Settlements: 1993-2008, NYU Law and Economics Research Paper No. 09-50, Cornell Legal Studies Research Paper No. 1497224 [2009], available at http://papers.ssrn.com/sol3/papers.cfm7abstract _id=1497224, cached at http://www.nycourts.gov/reporter/ webdocs/SSRN_Attorneys_Fees_Expenses.htm) and compares favorably to other class action awards both in state and federal court. Consequently, the court finds the fee and expenses award requested reasonable and justified in light of the legal services provided.
2. Waldman Fee
For the reasons stated in the parallel federal memorandum, order and judgment, $25,000 in attorneys’ fees are awarded to Mr. Waldman’s counsel to cover both fees and expenses. This award is to come from the $15 million allocation to counsel for reimbursement of expenses.
C. Incentive Award
New York’s statutory scheme for class actions does not provide for incentive fees. Nor does it prohibit such awards. Indeed, in at least one class action, such fees have been awarded. (Mark Fabrics Inc. v GMAC Commercial Credit LLC, 2005 NY Slip Op 30297[U] [2005, Cahn, J.]; but see Flemming, 56 AD3d at 166-167 [court refused to award incentive fees, but leave to the Court of Appeals has been granted].) The court here sees no reason not to award a modest incentive fee to a number of the class members in light of the effort they have expended in this nine-year litigation. Such a fee, ranging from $1,000 to $1,500, cannot be argued to be a temptation to settle this years-long litigation for a suboptimal amount or to bring frivolous litigation. Rather, it merely puts these class representatives on a par with *612 the federal class representatives (see In re MetLife Demutualization Litig., — F Supp 2d —, —, 2010 WL 517389, *67, 2010 US Dist LEXIS 12413, *187-188 [ED NY Feb. 12, 2010] [awarding $1,500 to the four federal class representatives]) and reimburses them for any expenses they incurred to participate in the action. This award, the court believes, will encourage class representatives to bring needed class actions without worry that their expenses will not be covered. The award is to be made from the expenses allocated to class counsel.
Eight state named plaintiffs request incentive fees. Theresa Hazen, however, has never been certified as a class representative, and the court, therefore, makes no award to her. Mark Smilow also is not a designated class representative. In fact, the Appellate Division specifically removed Mr. Smilow as a representative. (Fiala, 52 AD3d at 251.) Mr. Smilow, as a member of a firm acting as class counsel, could not have been relied upon to serve as a check on counsel and was not an appropriate class representative. (See Dank v Sears Holding Mgt. Corp., 59 AD3d 584 [2d Dept 2009] [conflict exists where class representative and class counsel are one and same]; Tanzer v Turbodyne Corp., 68 AD2d 614, 620 [1st Dept 1979] [obvious function of class representative is to check attorneys and should have measure of independence from counsel].) Consequently, the court will not make an award to Mr. Smilow. Similarly, the court declines to award a fee to Mr. Shah, who purchased a minimum annuity shortly before demutualization, as a speculator.
On the other hand, the court awards Eugenia J. Fiala, Paulette Beliunas, John Brophy and Ira J. Gelb, each, $1,500. June Gelb is awarded $1,000. These fees are to be paid as reimbursable expenses from the $15 million award to counsel.
In sum, it is ordered that the settlement of this action and the federal action for $50 million, $32.5 million of which is to be allocated to the closed block and $2.5 million of which is to be allocated as a cy pres award to the Foundation for the National Institutes of Health, is approved by the court as fair, adequate and reasonable; and it is further ordered that the total sum of $15 million, paid from the $50 million settlement fund, is allocated for attorneys’ fees and reimbursable expenses to state and federal class counsel, from which $25,000 is to be paid as counsel fees to the Waldman objector and $13,000 to the named representatives as awarded herein, these sums to be allocated as reimbursable expenses; and it is further ordered that all plaintiffs’ counsel associated with this case have agreed on a *613 division of fees and expenses. Unless there is an objection received by this court within 10 days from the date of this order, any claim by counsel, anyone employed by counsel, any plaintiff or any other person, is barred; and it is further ordered that the plaintiffs are to submit, within 10 days from the date of this order, a judgment indicating the full and correct names of the recipients for, and the exact amounts of, all payments to be made by defendants in accordance with this decision/order and the parallel federal memorandum, order and judgment.

. Notice was given to the class by publication in the national and local editions of the Wall Street Journal and the New York Post, once per week for three consecutive weeks and by sending mail notice to a random sample of 500,000 policyholders, whose names were obtained from Metlife’s records. Two hundred fifty-six class members opted out.

. The advisors were Fried, Frank, Harris, Shriver & Jacobson LLP (legal), The Blackstone Group L.E (financial), Hillman & Robertson, Inc. (actuarial) and Ernst & Young LLP (accounting).

. Judge Weinstein made findings regarding the proposed settlement when he dismissed the trial jury. He first noted that the nine-year-old case had been “thoroughly explored under adversarial conditions,” that extensive litigation had taken place in federal and state court and that negotiations had been conducted at arm’s length after full discovery, by experienced and fully-informed counsel. Inter alia, he found: assessing the strength and weakness of the case, the parties appropriately balanced the risks and benefits and reached a settlement advantageous to all parties; there is no evidence of collusion; there would not be a second opportunity for class members to opt out; and objections and counsel fees would be determined at a fairness hearing. (In re MetLife Demutualization Litig., 262 FRD at 208-209.)

. As noted in Wyly v Milberg Weiss Bershad & Schulman, LLP (12 NY3d 400, 409 [2009]):
“A class action is an exception to the rule ‘that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.’ The class action ‘was an invention of equity to enable it to proceed to a decree in suits where the number of those interested in the subject of the litigation is so great that their joinder as parties in conformity to the usual rules of procedure is impracticable.’ The absent individuals ‘would be bound by the decree so long as the named parties adequately represented the absent class and the prosecution of the litigation was within the common interest.’ ” (Citations omitted.)

. The tontine effect refers to a joint financial enterprise whereby all participants contribute but only the surviving participant reaps the financial benefit. (Black’s Law Dictionary 1334 [5th ed 1979]; Webster’s Collegiate Dictionary 1243 [10th ed 1997].)

. Notice to the class of the proposed settlement and dismissal of the action was required by CPLR 908 and was given. “Notice . . . shall be given ... in such manner as the court directs.” (CPLR 908.) Thus, the court has discretion in determining the appropriate notice (Klurfeld, 79 AD2d at 132) and has found the notice by publication to the millions of class members reasonable in informing of the settlement terms, how to object, the time in which to object and the fairness hearing. The Superintendent of Insurance received notice and did not object.

. As explained in In re Airline Ticket Commn. Antitrust Litig. (307 F3d 679, 682 [8th Cir 2002]):
“The cy pres doctrine takes its name from the Norman French expression, cy pres comme possible, which means ‘as near as possible.’ The doctrine originated to save testamentary charitable gifts that would otherwise fail. Under cy pres, if the testator had a general charitable intent, the court will look for an alternate recipient that will best serve the gift’s original purpose. In the class action context, it may be appropriate for a court to use cy pres principles to distribute unclaimed funds. In such a case, the unclaimed funds should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated.” (Citations omitted.)